**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

TERRY R. RAYMOND,

      Plaintiff,

vs.

U.S.A. HEALTHCARE
CENTER–FORT DODGE, L.L.C., and
the parent corporation U.S.A.
HEALTHCARE, INC.,

      Defendants.

No. C 05-3074-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

––––––––––––––––––

**TABLE OF CONTENTS**

*I.*  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.*  *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.*  *Procedural Background*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*II.*  *LEGAL ANALYSIS*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *A.*  *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . 7
    *B.*  *Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        *1.*   *U.S.A. Healthcare's initial argument* . . . . . . . . . . . . . . . 11
        *2.*   *Raymond's resistance*  . . . . . . . . . . . . . . . . . . . . . . . . 12
        *3.*   *U.S.A. Healthcare's reply*  . . . . . . . . . . . . . . . . . . . . . 13
    *C.*  *Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        *1.*   *Elements of a retaliation claim under Iowa law*  . . . . . . . . 14
        *2.*   *Raymond's showing on the required elements* . . . . . . . . . . 21

*III.*  *CONCLUSION*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Was a nurse legitimately fired for an incident in which she failed to handle properly the discovery of morphine missing from a medication cart or in violation of Iowa public policy in retaliation for filing a workers' compensation claim for a wrist injury?  That is the central dispute in this case, in which no federal claims remain before the court, and whether or not there are genuine issues of material fact to keep that dispute alive for jury determination is the question that animates the present ruling on the defendants' motion for summary judgment.

## I.  INTRODUCTION

### A.  Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case.  Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' motion for summary judgment.

The parties agree that plaintiff Terry R. Raymond, a Registered Nurse (R.N.), began working for defendant U.S.A. Heathcare Center–Fort Dodge and its parent corporation, defendant U.S.A. Healthcare, Inc. (collectively, "U.S.A. Healthcare"), in August 2001.  Raymond worked first as a unit manager, then as a "floor nurse, RN supervisor."  She worked in the latter position until she was terminated on February 21, 2005.

In November 2002, Raymond suffered a wrist injury in the course of her employment with U.S.A. Healthcare, for which she subsequently filed a workers' compensation claim.  After working with pain for some time, Raymond and her physician decided that surgery was appropriate for this injury.  At some point in the processing of Raymond's workers' compensation claim, Raymond asked the Director of Nursing, Greg

Seward, to write a letter on her behalf to her insurer about her inability to return to work. Seward was cooperative, wrote the letter, and did not give Raymond any difficulty about it. Raymond was off work for four months recovering from her surgery.

While Raymond was off work recovering from her surgery, she contacted Seward to suggest that she could come in to work a four-hour shift if another nurse was also on duty. However, owing to her restrictions, Raymond could not perform CPR at that time, which she agrees is an important skill for someone in her position. U.S.A. Healthcare declined to let Raymond return to work a four-hour shift under those circumstances, and Raymond does not complain about that decision. In contrast, when Raymond was released to return to work after surgery without such restrictions, U.S.A. Healthcare allowed her to return to work. U.S.A. Healthcare paid Raymond's workers' compensation claim and granted Raymond any accommodations that she requested for her wrist injury, with the exception of declining to allow her to work a four-hour shift when she could not perform CPR.

U.S.A. Healthcare had various policies in place concerning "narcotics counts" for drugs on a unit's medication cart and also had policies and notification procedures if a discrepancy in the count was discovered. Raymond asserts that she was not aware at the time of her employment of all of those policies. Raymond agrees, however, that the policies provide that both the "on-coming" nurse and the "off-going" nurse at a shift change are supposed to conduct a "narcotics count" of drugs on a unit's medication cart and that the keys to the medication care are not supposed to be exchanged without this count.

On the morning of February 19, 2005, eleven days after Raymond's return to work, another nurse, Lisa Irving, came in to start her shift, and requested the keys for the medication cart from Raymond. Raymond was working to complete paperwork at the

conclusion of her own overnight shift, so Raymond gave Irving the keys, and Irving began a "narcotics count" on the medication cart without Raymond's assistance. U.S.A. Healthcare contends that the procedures followed by Raymond and Irving were contrary to its policies. Irving discovered that the morphine count was "off," although the parties dispute precisely the amount of the discrepancy. Upon discovery of the discrepancy, Raymond and Irving began looking for the missing morphine. Irving found 2 ccs of the missing morphine in a syringe discarded in the garbage that had been sitting on the medication cart. Raymond believed that this syringe had been inadvertently thrown away and recorded it as "accidentally wasted" on an Individual Narcotic Record for the patient to whom she had been giving the morphine. Irving and Raymond continued to look for more missing morphine, including checking the medication cart to see if any missing morphine was "jammed" in the cart. No other morphine was discovered. The parties dispute the amount, if any, of additional morphine that was still missing. It was not until some ten hours later, at about 4:00 p.m. on February 19, 2005, that Raymond contacted Seward to notify him of the missing morphine. However, U.S.A. Healthcare's policy required that the Director of Nursing be notified "immediately" if a drug discrepancy was discovered.

On February 20 and 21, after learning of the drug count discrepancy, Seward interviewed the three nurses involved in the narcotics counts at the beginning and end of Raymond's shift on February 18-19, Nurses Irving, Connie Just, and Raymond. On February 21, 2005, following Seward's interviews, Seward and Craig Bell, the Administrator at U.S.A. Healthcare, met with Raymond. During the meeting, Raymond was terminated. The only reasons given for terminating Raymond were the events and problems surrounding the morphine shortage.

## B. Procedural Background

Following her termination, Raymond filed suit against U.S.A. Healthcare Center–Fort Dodge and U.S.A. Healthcare, Inc., in Iowa District Court[1] asserting discharge in violation of public policy pursuant to IOWA CODE § 135C.46 (retaliation for "whistle-blowing") and discharge in violation of public policy pursuant to IOWA CODE § 85.18 (retaliation for filing a workers' compensation claim). After the defendants answered Raymond's original petition on May 18, 2005, Raymond was granted leave to amend her petition on October 24, 2005, to add, as Counts III and IV of her petition, respectively, claims of disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216. After Raymond injected the federal ADA claim into this litigation, U.S.A. Healthcare removed this action to this federal court on November 8, 2006. U.S.A. Healthcare filed in this court its answer to Raymond's amended petition, now styled a Complaint in federal court, on November 14, 2005, denying Raymond's claims.

On September 21, 2006, Raymond moved to dismiss without prejudice Counts I, III, and IV, or her Complaint, but to retain her claim of wrongful termination in violation of public policy pursuant to IOWA CODE CH. 85, the workers' compensation retaliation claim. *See* Plaintiff's Motion To Dismiss Disability Claims And Violation Of Public Policy [Claim] Under Iowa Code [§] 135C.46 (docket no. 14). U.S.A. Healthcare filed no response to that motion, but now states in a footnote in its brief in support of its own subsequent motion for summary judgment that it does not resist Raymond's motion to dismiss her claims in Counts I, III, and IV. *See* Defendants' Brief In Support Of Motion

---

[1]The date stamp on the copy of Raymond's petition filed with U.S.A. Healthcare's notice of removal to federal court is unreadable.

5

For Summary Judgment (docket no. 15-3) at 2 n.1. Therefore, the court will grant Raymond's motion to dismiss all of her claims except her state-law claim of retaliation for filing a workers' compensation claim.

No party has suggested that the court should now relinquish supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367(c), despite the dismissal of the federal claim upon which federal removal jurisdiction was based. Although the court has contemplated such a course *sua sponte*, it has decided not to dismiss or remand the case to state court, because the litigation in this court is advanced to the point of dispositive motions, trial is set to begin in this court on March 26 2007, the remaining state-law claim does not involve any novel or complex issues, and it is unlikely that the parties could obtain as timely a trial date, if required, in state court, were this court to remand this action pursuant to 28 U.S.C. § 1367(c)(3). *See, e.g., Saeemodarae v. Mercy Health Servs.*, ___ F. Supp. 2d ___, 2006 WL 2848612, *20-*21 (N.D. Iowa Oct. 5, 2006) (identifying factors federal courts should consider in deciding whether or not to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 when all federal claims have been dismissed). Therefore, this litigation will proceed *in this court* only on Raymond's claim of wrongful discharge in violation of public policy based on Raymond's allegations that she was terminated in retaliation for filing a workers' compensation claim.

On October 6, 2006, U.S.A. Healthcare filed the Motion For Summary Judgment (docket no. 15), which is now before the court. Raymond filed a Resistance (docket no.18) on November 22, 2006, and U.S.A. Healthcare filed a Reply (docket no. 23) in further support of its motion on December 5, 2006. U.S.A. Healthcare did not request oral arguments on its Motion For Summary Judgment in either its original Motion or its Reply, but Raymond did request oral arguments in her Resistance. The court has not found oral arguments to be necessary to its disposition of the Motion For Summary

Judgment, nor will the court's schedule permit the timely scheduling of such oral arguments. Therefore, the court will render its ruling on U.S.A. Healthcare's Motion For Summary Judgment based on the parties' written submissions.

## II.  LEGAL ANALYSIS

### A.  Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b).  "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990).  In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377.

Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th

Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment discrimination cases." *See Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . . ," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "the ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). The court will apply these standards to the defendants' Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard

incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove such cases today than during the early evolution of federal and state anti-discrimination and anti-retaliation laws. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA and state anti-discrimination and anti-retaliation laws—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

### B. Arguments Of The Parties

#### 1.    U.S.A. Healthcare's initial argument

U.S.A. Healthcare contends that there are no genuine issues of material fact on Raymond's remaining claim of retaliation for filing a workers' compensation claim, because the undisputed facts show that Raymond was fired for mishandling of the keys to the medication cart and mishandling of the missing morphine incident. More specifically, U.S.A. Healthcare contends that Raymond cannot generate genuine issues of material fact on the "causation" and "lack of other justification" elements of her retaliation claim. Any supposed temporal proximity between Raymond's exercise of her right to workers' compensation and her termination, U.S.A. Healthcare argues, is just not enough to generate factual disputes on these elements. U.S.A. Healthcare also contends that Raymond has identified only five incidents that were related to her workers' compensation claim as supposedly generating genuine issues of material fact on the "causation" element of that claim. U.S.A. Healthcare argues, however, that none of these incidents is sufficient, nor is the totality of such incidents sufficient, to suggest that a retaliatory animus was the cause of Raymond's termination, where all of the incidents are innocuous, only one incident was even relatively close to Raymond's termination, and that incident involved only a legitimate inquiry about whether or not Raymond had received an "impairment rating" coupled with a comment that her hand "doesn't look so good." U.S.A. Healthcare argues that no other evidence has been generated in addition to the supposed proximity of this incident to Raymond's termination to attempt to generate an inference of retaliatory intent.

Furthermore, U.S.A. Healthcare argues that it is indisputable that Raymond was terminated based on events surrounding the morphine shortage, including her failure to follow U.S.A. Healthcare's policies relating to counts of and discrepancies in narcotic

drugs and the handling of keys to the medication cart. U.S.A. Healthcare argues that Raymond's termination was justified by the circumstances and, indeed, that Raymond's conduct was reviewed by the Iowa Board of Nursing, which also found that Raymond's conduct did not meet professional standards. Thus, U.S.A. Healthcare argues that there clearly are legitimate reasons for Raymond's termination other than supposed retaliation.

### 2.     *Raymond's resistance*

Raymond, on the other hand, contends that she has generated genuine issues of material fact on the necessary connection between her claim for workers' compensation benefits and her termination and, moreover, that the causation and motivation elements of a retaliation claim are generally fact questions for the jury. In support of her position, she contends that the number of incidents giving rise to an inference of retaliation is irrelevant, where the inference can, nevertheless, be drawn. She asserts that several incidents here give rise to the necessary inference, including the following: a supervisor's comment, during the summer of 2004, that there would be no raises that year owing to the number of workers' compensation claims; the same supervisor's comments in February 2005 that Raymond's hand "doesn't look so good"; and questions by the same supervisor in February 2005 about whether or not Raymond had received an impairment rating, which Raymond contends were intended solely to make her uncomfortable and self-conscious about her injury in retaliation for making a workers' compensation claim. Raymond also argues that treatment of other employees who made workers' compensation claims is indicative of a retaliatory animus. Specifically, Raymond points to adverse actions against Karen Barnett and Kristie Ricklefs after they made workers' compensation claims, and the fact that only one of the fifty-four people to make workers' compensation claims against U.S.A. Healthcare in the last seven years is still employed by U.S.A. Healthcare. She also points out that Craig Bell, the Administrator of U.S.A. Healthcare, denied during his

deposition having any knowledge of the amount of money spent by U.S.A. Healthcare on a monthly basis on workers' compensation claims, despite deposition testimony of another employee that such reports were prepared monthly and addressed to Mr. Bell and were received and reviewed by Mr. Bell.

Raymond also argues that there is evidence that U.S.A. Healthcare's proffered reasons for terminating her are pretextual. That evidence, she contends, includes evidence that U.S.A. Healthcare used varying methods of enforcing company policy, including taking no steps to enforce the policies upon which it now relies when those policies were violated by persons who had not made workers' compensation claims, and changing the reasons that U.S.A. Healthcare has given for terminating Raymond.

### 3. *U.S.A. Healthcare's reply*

In reply, U.S.A. Healthcare expressly concedes, for purposes of its summary judgment motion, that Raymond can satisfy the first two elements of her retaliation claim, "protected activity" and "adverse action." On the other hand, U.S.A. Healthcare contends that Raymond has simply ignored U.S.A. Healthcare's contention that she cannot generate any genuine issue of material fact on the "causation" and "lack of justification" elements of her claim, because her termination was clearly justified by legitimate reasons, specifically, the events surrounding the morphine shortage and Raymond's failure to follow U.S.A. Healthcare's policies. Anti-retaliatory legislation, U.S.A. Healthcare contends, does not insulate an employee from discharge for past or present inadequacies or unsatisfactory performance. U.S.A. Healthcare contends that Raymond has only marshaled hearsay and innuendo concerning the treatment of other employees in an attempt to generate genuine issues of material fact on causation and retaliatory motive, but such submissions simply do not dispel the legitimate reasons for her own termination. U.S.A.

Healthcare also argues that the reasons on which it relied to terminate Raymond were all confirmed by the Iowa Board of Nursing.

## *C. Discussion*

### *1.    Elements of a retaliation claim under Iowa law*

The first issue that the court must settle is precisely what are the elements of Raymond's retaliation claim.  U.S.A. Healthcare has framed its arguments in terms of four elements, which it calls the "clarity element, jeopardy element, causation element, and absence-of-justification element," citing *Davis v. Horton*, 661 N.W.2d 533, 535 (Iowa 2003).  Raymond, on the other hand, has framed her argument in terms of a three-element *prima facie* case, and if that case is sufficient, consideration of whether U.S.A. Healthcare's supposedly legitimate reasons for its conduct, offered in response to Raymond's *prima facie* case, are really "pretexts" for retaliatory conduct.  The court finds that the parties are really addressing the same issues, albeit from somewhat different perspectives.

U.S.A. Healthcare is correct that, in *Davis v. Horton*, 661 N.W.2d 533 (Iowa 2003), the Iowa Supreme Court explained,

> An employee asserting a wrongful-discharge claim based on violation of public policy must satisfy the court as to all of the following factors:
> > (1) The existence of a clearly defined public policy that protects an activity.
> > (2) This policy would be undermined by a discharge from employment.
> > (3) The challenged discharge was the result of participating in the protected activity.
> > (4) There was [a] lack of other justification for the termination.

> [*Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 (Iowa 2000)]. These requirements have been identified as the clarity element, jeopardy element, causation element, and absence-of-justification element. *Id.*

*Davis*, 661 N.W.2d at 535 (paraphrasing rather than quoting this statement of elements from *Fitzgerald*). Subsequently, the Iowa Supreme Court reiterated these four elements of a claim of wrongful discharge in violation of public policy, citing *Davis*, but cited as in accord the identification of the following *three* elements of the claim from an earlier decision: "(1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge." *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004) (citing *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998)). This court finds that it is illuminating to examine the *Fitzgerald* and *Teachout* decisions upon which the Iowa Supreme Court relied for its various statements of the elements of a claim or retaliatory discharge in violation of public policy.

In *Fitzgerald*, the Iowa Supreme Court actually "identified the elements of an action to recover damages for discharge in violation of public policy" as the following: "(1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge." *Fitzgerald*, 613 N.W.2d at 281 (citing *Teachout*, 584 N.W.2d at 299). Thus, even in *Fitzgerald*, the court conceived of the claim as consisting of *three*, not *four*, elements. Only subsequently, *in a footnote*, did the court in *Fitzgerald* observe,

> Some courts are beginning to articulate the elements of a cause of action for wrongful discharge as:
> 1. The existence of a clear public policy (the clarity element).
> 2. Dismissal of employee under circumstances alleged in the case would jeopardize public policy (the jeopardy element).

3. The plaintiff engaged in public policy conduct and this conduct was the reason for the dismissal (the causation element).

4. Employer lacked an overriding business justification for the dismissal (the absence of justification element).

*Gardner v. Loomis Armoured, Inc.*, 128 Wash.2d 931, 913 P.2d 377, 382 (1996); *Collins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 653, 657 (1995).

This approach is derived from the methodology proposed by Dean and Law Professor Henry H. Perrit, Jr. *See generally* Henry H. Perrit, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self-Interest Lie?*, 58 U. Cin. L.Rev. 397-430 (1989). This four part structure of proof is now detailed in Professor Perrit's multi-volume treatise on the subject. *See* Perritt § 7.9, at 18. *This is a helpful guide and actually parallels the approach we have followed in addressing the tort on a case-by-case method.*

*Fitzgerald*, 613 N.W.2d at 282 n.2 (emphasis added). The court in *Fitzgerald* also opined on the respective roles of the court and the jury in determination of the required elements, as follows:

It is generally recognized that the existence of a public policy, as well as the issue whether that policy is undermined by a discharge from employment, presents questions of law for the court to resolve. 2 Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* § 7.9, at 18 (4th ed.1998) [hereinafter Perritt]; Paul H. Tobias, *Litigating Wrongful Discharge Claims* § 5:22, at 69 (1995) [hereinafter Tobias]; *Roberts v. Dudley*, 140 Wash.2d 58, 993 P.2d 901, 905 (2000) (existence of public policy is a question of law). Thus, these questions are generally capable of resolution by a motion for summary judgment. *On the other hand, the elements of causation and motive are factual in nature and generally more suitable for resolution by the finder of fact.* Tobias § 5:22, at 69-70. *Notwithstanding, to withstand summary judgment a plaintiff must not only satisfy the court on the public policy and*

> jeopardy elements of the tort, but offer adequate evidence from
> which a lack of justification for termination can be inferred.
> Perrit § 7.9, at 18.

*Fitzgerald*, 613 N.W.2d at 282 (emphasis added). The court then considered whether the employee in the case then before the court had established the required public policy and jeopardy to public policy, *id.* at 282-89, and finally, whether the employee had satisfied the "causation element," noting that "the existence of other legal reasons or motives for the termination are relevant in considering causation." *Id.* at 289. The court ultimately found that the plaintiff employee had generated genuine issues of material fact concerning the employer's justifications, such that summary judgment had been improperly granted. *Id.*

At least three points are raised by this examination of the *Fitzgerald* decision. First, the court stated a three-element case, citing *Teachout*, 584 N.W.2d at 299, and only mentioned *in a footnote* that "some courts" stated a four-element case. *Id.* at 281-82 & n.2. Thus, *Fitzgerald* did not expressly adopt a four-element case. Second, the court found a four-element statement of the case to be a "helpful guide," in part because it clearly incorporated the employer's "justifications," *i.e.*, the employer's motives, into the assessment of the case. *Id.* at 282 & n.2. Third, the court actually relied on a three-element case, finding "justification" or the "lack of justification" relevant in the context of the third element, which it still described as the "causation" element. *Id.* at 289.

In *Teachout*, on which the Iowa Supreme Court relied in *Fitzgerald*, the Iowa Supreme Court stated the elements of a claim to recover damages for discharge in violation of public policy, as follows: "(1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two." *Teachout*, 584 N.W.2d at 299. One of the elements "in controversy" in that case was "whether [protected]

activity was causally linked to [the plaintiff's] discharge." *Id.* at 300. As to that element, the court found that the plaintiff had established only temporal proximity between her protected activity and her discharge, but had failed to establish a "causal connection," where she had conceded that there was also "a personality conflict" between her and her supervisor. *Id.* at 303. Thus, in *Teachout*, the question of other justifications for the plaintiff's termination was also relevant to the "causation" issue. *Id.*

In the context of Title VII and the ICRA, the Iowa Supreme Court has repeatedly recognized that a *prima facie* case of retaliation requires proof of three elements: "a plaintiff must show (1) he or she was engaged in statutorily protected activity, (2) the employer took adverse employment action against him or her, and (3) there was a causal connection between his or her participation in the protected activity and the adverse employment action taken." *See, e.g., Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006). Although the Iowa Supreme Court still has not expressly adopted the traditional *McDonnell Douglas* burden-shifting analysis for retaliation claims under the anti-discrimination statutes, it has failed to do so only because in the case presenting the issue, the court found that the plaintiff had failed to establish a *prima facie* case. *See Yockey v. State*, 540 N.W.2d 418, 422 (Iowa 1995); *and compare Lynch v. Des Moines*, 454 N.W.2d 827, 834 n.6 (Iowa 1990) ("We note that the applicability of the traditional burden-shifting analysis to [the plaintiff's] claim of illegal retaliation is not questioned," although application of the burden-shifting analysis to a hostile environment claim was "questionable" where the alleged discrimination did not involve deprivation of a tangible job benefit). The Iowa Court of Appeals, on the other hand, has held that

> If the employee has made a prima facie case of retaliatory discharge, the employer must articulate a legitimate, nonretaliatory reason for the action. [*Hulme v. Barrett*, 449 N.W.2d 629, 633 (Iowa 1989)]. If the employer were to

> prove sufficient evidence of a reason other than retaliation, the
> employee could still prevail if she can prove the reason offered
> was in fact pretextual. *Id.*

*Gary v. Heritage Nat'l Healthplan Servs., Inc.*, 485 N.W.2d 851, 856 (Iowa Ct. App. 1992).

The upshot of all this, in this court's view, is that, under Iowa law, the elements of a claim—or at least a *prima facie* claim—of retaliatory discharge in violation of public policy are the following: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered adverse employment action; and (3) the circumstances give rise to an inference that the plaintiff's discharge was causally related to her protected activity. *See Fitzgerald*, 613 N.W.2d at 281; *Teachout*, 584 N.W.2d at 299; *see also Lloyd*, 686 N.W.2d at 228 (noting that this three-element case is in accord with the four-element case identified in *Davis*, 661 N.W.2d at 535). Whether or not the employer has *adequate* other justifications for its action is necessarily relevant to whether or not the adverse action against the plaintiff was "caused" by the plaintiff's protected activity. *See Fitzgerald*, 613 N.W.2d at 289; *Teachout*, 584 N.W.2d at 303. To put it another way, assuming that the burden-shifting analysis is applicable, *see Lynch*, 454 N.W.2d at 834 n.6 ("We note that the applicability of the traditional burden-shifting analysis to [the plaintiff's] claim of illegal retaliation is not questioned"), whether there are "other justifications" that the employer can offer for its action, and whether those "other justifications" are merely pretexts for retaliatory action, are questions that are certainly relevant to whether the plaintiff can ultimately show that her discharge was caused by protected activity.

Framed in this context, the mere existence of "other justifications" for adverse action against an employee does not disprove a retaliation claim. Indeed, the Iowa Supreme Court explained in *Fitzgerald* that "[t]he protected conduct must be the

19

determinative factor in the decision to terminate the employee," *Fitzgerald*, 613 N.W.2d at 289, and in *Teachout*, the court defined "determinative factor" as "the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision." *Teachout*, 584 N.W.2d at 302 (quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)). This standard clearly contemplates that, even if there are "other justifications," even "predominant" justifications, that are legitimate, the plaintiff can still prevail by showing that an illegitimate retaliatory reason was the "determinative factor" or "final straw in [the employer's] decision to terminate [the plaintiff's] employment." *See Davis*, 661 N.W.2d at 536 (the protected activity "was not the final straw in Horton's decision to terminate Davis's employment," so that it was not the "cause" of the allegedly retaliatory termination); *Fitzgerald*, 613 N.W.2d at 289 ("[T]he existence of other legal reasons or motives for the termination are relevant in considering causation," but are not, standing alone, dispositive of the claim).

If the employer does offer "other justifications" for allegedly retaliatory conduct, however, in order for the plaintiff to defeat summary judgment on the retaliation claim, the plaintiff must generate genuine issues of material fact that the "other justifications" are not the true reasons for the employer's actions, but are, instead, pretexts for retaliatory action or insufficient, standing alone, to justify the adverse action in question, so that the plaintiff's protected activity was the "final straw" in favor of the adverse action. *See Fitzgerald*, 613 N.W.2d at 282 ("[T]o withstand summary judgment a plaintiff must not only satisfy the court on the public policy and jeopardy elements of the tort, but offer adequate evidence from which a lack of justification for termination can be inferred."); *id.* at 289 (finding that the plaintiff employee had generated genuine issues of material fact concerning the employer's justifications, such that summary judgment had improperly been

granted); *cf. Davis*, 661 N.W.2d at 536 (the protected activity "was not the final straw in Horton's decision to terminate Davis's employment," so that it was not the "cause" of the allegedly retaliatory termination). To win, the plaintiff must ultimately prove that any "other justifications" are pretexts for retaliatory action or are insufficient, standing alone, to justify the adverse action in question, *i.e.*, that other "real" justifications for the employer's actions are lacking. *Davis*, 661 N.W.2d at 535 (identifying as an element of the plaintiff's retaliation claim that "[t]here was [a] lack of other justification for the termination"). To put the requirement in the affirmative, to win a retaliation claim, the plaintiff must show that, notwithstanding other justifications for adverse action, the plaintiff's protected activity was the "determinative factor"—the "final straw"—leading to the adverse action. *Fitzgerald*, 613 N.W.2d at 289 ("The protected conduct must be the determinative factor in the decision to terminate the employee."); *Teachout*, 584 N.W.2d at 302 (defining "determinative factor" as "the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision," quoting *Smithway Motor Xpress, Inc.*, 464 N.W.2d at 686); *see also Davis*, 661 N.W.2d at 536 (the protected activity "was not the final straw in Horton's decision to terminate Davis's employment," so that it was not the "cause" of the allegedly retaliatory termination).

### 2. *Raymond's showing on the required elements*

There is no dispute, at least for purposes of summary judgment, that Raymond can show that she engaged in protected activity, by filing a workers' compensation claim, and that she suffered adverse employment action, in that she was fired. *See, e.g., Fitzgerald*, 613 N.W.2d 281 (identifying these as the first two elements of a claim of retaliatory discharge in violation of public policy, citing *Teachout*, 584 N.W.2d at 299). Thus, the question here is whether or not Raymond can prove that the adverse action was caused by

her protected activity. *Id.* (third element). As explained above, part of that analysis depends upon whether or not Raymond can generate genuine issues of material fact that U.S.A. Healthcare's proffered reasons—mishandling of keys to a medication cart and an incident involving missing morphine, in violation of U.S.A. Healthcare's policies—are pretexts for retaliation for filing a workers' compensation claim or insufficient, standing alone, to justify U.S.A. Healthcare's actions.

As mentioned above, to satisfy the "causation" element, "[t]he protected conduct must be the determinative factor in the decision to terminate the employee." *Fitzgerald*, 613 N.W.2d at 289 (citing *Teachout*, 584 N.W.2d at 301-02). Thus, "[t]he causation standard is high, and requires [the court] to determine if a reasonable fact finder would conclude [the employee's protected activity] was the determinative factor in the decision to discharge him." *Id.* U.S.A. Healthcare is correct, however, that "'the protection afforded by anti-retaliatory legislation [or the common law] does not immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination.'" *Teachout*, 584 N.W.2d at 302 (quoting *Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992)).

Although it is not the court's place on a motion for summary judgment to weigh the evidence and determine the truth of the matter, *see, e.g., Bunda*, 369 F. Supp. 2d at 1046, it is clear to the court that, viewing the record in this case in the light most favorable to Raymond, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts), a reasonable fact finder could conclude that Raymond's workers' compensation claim—the protected activity at issue here—was the determinative factor in U.S.A. Healthcare's decision to discharge her. *Fitzgerald*, 613 N.W.2d at 289. Raymond has generated genuine issues of material fact

that employees of U.S.A. Healthcare who filed workers' compensation claims were singled out for retaliatory conduct, while those who did not were treated more favorably than similarly situated persons who did. Somewhat more specifically, Raymond points to adverse actions against Karen Barnett and Kristie Ricklefs after they made workers' compensation claims, the fact that only one of the fifty-four people to make workers' compensation claims against U.S.A. Healthcare in the last seven years is still employed by U.S.A. Healthcare, evidence that U.S.A. Healthcare used varying methods of enforcing company policy, including taking no steps to enforce the policies upon which it now relies when those policies were violated by persons who had not made workers' compensation claims, but enforcing the policies against persons, such as Raymond, who had filed workers' compensation claims. Raymond points out that she was the only person terminated for the February 19, 2005, missing morphine incident, but that the other nurses involved, who had not filed workers' compensation claims, were not disciplined. Contrary to U.S.A. Healthcare's contentions, the court finds that Raymond has generated "genuine" factual disputes, not merely hearsay and "innuendo," concerning differential treatment of other employees who did or did not file workers compensation claims by identifying adequate evidence in the record to support her contentions. *See, e.g., Hartnagel*, 953 F.2d at 394 (an issue of material fact is "genuine" if it has a real basis in the record, citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87).

This court has recognized that an employee can demonstrate that an employer's proffered reasons for allegedly retaliatory action are pretexts for retaliatory action by showing, for example, that the employer varied from its normal policy or practice to address the employee's situation, *see Podkovich v. Glazer's Distributors of Iowa, Inc.*, 446 F. Supp. 2d 982, 1010-11 (N.D. Iowa 2006) (citing *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir. 2001)), or by showing that the employer routinely treated

similarly situated employees who were not in the protected class more leniently, *id.* at 1011 (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002)), or by demonstrating that the employee was discharged pursuant to an inconsistent policy. *Id.* (citing *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 860 (8th Cir. 2005)); *see also Brown v. Farmland Foods, Inc.*, 178 F. Supp. 2d 961, 985 (N.D. Iowa 2001) (concluding that failure to apply the policy on which the employer relied to employees who did not file workers' compensation claims was a ground to question the employer's proffered legitimate reason for the plaintiff's dismissal); *Clarey v. K-Products, Inc.*, 514 N.W.2d 900, 903 (Iowa 1994) (evidence from four co-employees, who all filed workers' compensation claims within one year of the plaintiff's claim, that they were harassed after filing their workers' compensation claims was admissible as tending to show a pattern of conduct and, thus, motive, intent, plan, and absence of mistake or accident within the meaning of Rule 404(b) of the Federal Rules of Evidence). These are the kinds of conduct of U.S.A. Healthcare to which Raymond has pointed. To put it another way, even if "'the protection afforded by anti-retaliatory legislation [or the common law] does not immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination,'" *Teachout*, 584 N.W.2d at 302 (quoting *Hulme*, 480 N.W.2d at 43), a reasonable juror could conclude that an employee's past or present inadequacies or unsatisfactory performance was not the real reason for an employer's decision to discharge that employee, if the employer had not found comparable conduct of similarly-situated employees, who differed only in their lack of workers' compensation

claims, sufficient ground to terminate them. Raymond has generated genuine issues of material fact that such circumstances are present here.[2]

Moreover, experience teaches that a relatively minor violation of casually enforced policies could be seized upon by an employer with even modest sophistication as a "golden opportunity" to rid itself of an employee toward whom the employer wished to retaliate for protected activity, such as filing a workers' compensation claim. *See* OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881) ("The life of the law has not been logic; it has been experience."); *see also Riordan*, 831 F.2d at 697-98 (recognizing that it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge, especially when the employee in question is not of the highest caliber). Because Raymond has generated genuine issues of material fact that that is precisely what happened here, she should be allowed to tell her tale to the jury.

### III. CONCLUSION

Notwithstanding that U.S.A. Healthcare has presented evidence that Raymond mishandled keys to a medication cart, mishandled a "narcotics count," and mishandled an incident involving missing morphine, all supposedly in violation of U.S.A. Healthcare's policies, the court nevertheless finds that these "other justifications" for discharging Raymond do not place beyond dispute the reasons for Raymond's discharge. Instead, the court concludes that Raymond has generated genuine issues of material fact that U.S.A. Healthcare's proffered reasons for her discharge are pretexts for retaliatory action.

---

[2]In light of this conclusion, the court need not consider whether Raymond has generated genuine issues of material fact that U.S.A. Healthcare gave varying reasons for her termination.

THEREFORE, the defendants' October 6, 2006, Motion For Summary Judgment (docket no. 15) is **denied** in its entirety.

**IT IS SO ORDERED.**

**DATED** this 22nd day of December, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA